## UNITED STATES DISTRICT COURT FOR THE

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DYRONNET KADOR O/B/O HER MINOR CHILD, DYAUGHNA WILLIS, | CIVIL ACTION NO. |
| PLAINTIFF, | |
| VS. | DISTRICT JUDGE: |
| SHERIFF SIDNEY J. GAUTREAUX, III; CHIEF MURPHY J. PAUL, JR.; MAYOR-PRESIDENT SHARON WESTON BROOME; THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE; DEPUTY ENO GUILLOT; DEPUTY JANE DOE; OFFICER XYZ 1; OFFICER XYZ 2; OFFICER XYZ 3; AMERICAN ALTERNATIVE INSURANCE CORPORATION; and XYZ INSURANCE COMPANY, | MAGISTRATE: |
| DEFENDANTS. | |

## COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, Dyronnet Kador, on behalf of her minor child Dyaughna Willis, who is entitled to relief for the wrongful killing of her father, Deaughn Willis. The Plaintiff is a person of the full age of majority who is domiciled in Maricopa County, Arizona, and respectfully represents the following:

## INTRODUCTION

1.      On January 8, 2022, five armed law enforcement officers arrived in tactical gear at Deaughn Willis's residence in Baton Rouge and began banging on the front door to his apartment without announcing themselves as law enforcement officers. These five officers were purportedly looking for Deaughn's twin brother, Keaughn Willis, in connection with a wellness check on an

adult "habitual runaway" who was not answering her phone. These officers had neither a search warrant nor an arrest warrant. There were no exigent circumstances. Nevertheless, they started banging on Deaughn's door so aggressively that it began to bow.

2.      Deaughn was not alone in the apartment when these officers arrived. He was there with his mother, stepfather, and two younger brothers—all of whom were startled by their front door rattling from the officers' blows. Deaughn's stepfather twice shouted, "Who is it?" But the defendant officers still refused to identify themselves. Frightened, and not knowing who was aggressively knocking, Deaughn's mother ushered her younger children to safety in the back of the apartment while she dialed 911. Deaughn, in an attempt to assess the situation and protect his family, cautiously approached the door. As soon as he cracked the door open, however, Deputy Eno Guillot began firing his military-style weapon into the occupied apartment, shooting Deaughn multiple times and inflicting wounds that would later kill him.

3.      This senseless tragedy occurred because of improper training and the inadequate policies of the East Baton Rouge Sheriff's Office ("EBRSO") and Baton Rouge Police Department ("BRPD"), and the willful disregard for life and rights under the U.S. Constitution committed by the EBRSO deputies and BRPD officers (collectively, "defendant officers"). The defendant officers had no reasonable basis to approach Deaughn's residence with their military-style weapons at the ready. They had no reasonable basis to intentionally conceal their identity by positioning themselves outside the view of the apartment door's peephole. They had no reasonable basis to dramatically escalate the risk of a violent confrontation by aggressively banging on the door with no idea who was inside. They had no reasonable basis to refuse to identify themselves when asked to do so by the residence's frightened occupants. Most importantly, they had no reasonable basis to use excessive and deadly force. In each of these respects, the defendant officers

who planned and carried out this fatal attack violated the rights of Deaughn under the Constitution. And despite the actions of Deputy Guillot in shooting and killing Deaughn, he received no discipline—either public or private—and returned to his post as an armed law enforcement officer the very next day.

4.      Sheriff Gautreaux and Chief Paul bear direct responsibility for the tortious conduct and violation of rights under the Constitution that killed Deaughn and traumatized his family. The EBRSO and BRPD have a long-established policy, custom, practice, and pattern of:

  a.  inadequately screening employees, showing a deliberate indifference to the substantial risk that a violation of the civil rights of a third party will occur;

  b.  failing to adequately train, supervise, and discipline their employees, including the defendant officers;

  c.  endorsing and condoning the unlawful use of force and unlawful use of excessive force;

  d.  allowing officers to knock and enter without properly announcing their identity as law enforcement officers; and

  e.  failing to render medical care to citizens who have been seized, detained, or arrested.

5.      In view of the manifold failures of Sheriff Gautreaux and Chief Paul, the events that led to Deaughn's death were all but inevitable.

6.      Ms. Kador understands that this lawsuit cannot bring back Deaughn or compensate Dyaughna Willis adequately for the loss of the life she might have had with her father, or for the harms that have burdened Dyaughna Willis since her father was killed. But this action invokes vital rights under our Constitution to seek justice and accountability.

3

## JURISDICTION AND VENUE

7.    Plaintiff brings this action under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and Louisiana law.

8.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the U.S. Constitution and federal law, and this action seeks redress for the violation of federal constitutional and civil rights.

9.    This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

10.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000, and Plaintiff is not a citizen of the same state as any of the Defendants.

11.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this district and all Defendants are residents of Louisiana, and pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## JURY DEMAND

12.    Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

13.    Plaintiff Dyronnet Kador is the mother and natural tutrix of the minor child Dyaughna Asia Willis. Plaintiff is domiciled in Maricopa County, Arizona, where she resides with

4

Dyaughna. Dyronnet Kador has never been married. Dyaughna was born in Baton Rouge, Louisiana, in 2016. Deaughn Asian Willis was/is the father of Dyaughna, acknowledged her, and is identified as her father on Dyaughna's birth certificate. Deaughn Willis had no other children. As the only "surviving . . . child . . . of the deceased," Dyaughna Willis asserts through the Plaintiff a survival action under Louisiana Civil Code Article 2315.1 for damages suffered by Deaughn prior to his death, and a wrongful death action under Louisiana Civil Code Article 2315.2 for her own damages.

14.     Made Defendants herein are the following:

a.  **SHERIFF SIDNEY J. GAUTREAUX, III**, in his official capacity, a person of the full age of majority who at all times was and is the Sheriff of East Baton Rouge Parish and domiciled in East Baton Rouge Parish, Louisiana.

b.  **CHIEF MURPHY J. PAUL, JR.**, in his official capacity, a person of the full age of majority who at all times was and is the Chief of the Baton Rouge Police Department and domiciled in East Baton Rouge Parish, Louisiana.

c.  **MAYOR-PRESIDENT SHARON WESTON BROOME**, in her official capacity, a person of the full age of majority who at all times was and is the Mayor-President of the City of Baton Rouge and Parish of East Baton Rouge, Louisiana.

d.  **THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE**, a municipality and a political subdivision of the State of Louisiana that are managed by a single, consolidated form of government, but not an agency, or department, or arm of the State of Louisiana (hereinafter "City/Parish"), which is also capable of suing and being sued. The East Baton

5

Rouge Parish Metropolitan Council is responsible for setting the policy of the City/Parish.

e. **DEPUTY ENO GUILLOT**, a person of the full age of majority, domiciled in Ascension Parish, Louisiana, who was employed at all relevant times by the EBRSO. Deputy Guillot is sued in his individual capacity.

f. **DEPUTY JANE DOE**, a person of the full age of majority, domiciled in the Parish of XYZ, Louisiana, who was employed at all relevant times by the EBRSO. Deputy Jane Doe is sued in her individual capacity.

g. **OFFICER XYZ 1**, a person of the full age of majority, domiciled in the Parish of XYZ, Louisiana, who was employed at all relevant times by the EBRSO and/or BRPD. Officer XYZ 1 is sued in his or her individual capacity.

h. **OFFICER XYZ 2**, a person of the full age of majority, domiciled in the Parish of XYZ, Louisiana, who was employed at all relevant times by the EBRSO and/or BRPD. Officer XYZ 2 is sued in his or her individual capacity.

i. **OFFICER XYZ 3**, a person of the full age of majority, domiciled in the Parish of XYZ, Louisiana, who was employed at all relevant times by the EBRSO and/or BRPD. Officer XYZ 3 is sued in his or her individual capacity.

j. **AMERICAN ALTERNATIVE INSURANCE CORPORATION**, an insurance company authorized to do and doing business in the State of Louisiana that provides general liability coverage and/or Excess of Loss Coverage for Sheriff Sidney J. Gautreaux, III, Deputy Eno Guillot, Deputy Jane Doe, Officers XYZ, the City/Parish, and/or the EBRSO. American

Alternative Insurance Corporation is domiciled and incorporated in Delaware, and its principal place of business is in New Jersey.

k. **XYZ INSURANCE COMPANY**, an insurance company authorized to do and doing business in the State of Louisiana that provides general liability coverage and/or Excess of Loss Coverage for Chief Murphy J. Paul, Jr., Officers XYZ, the City/Parish, and/or the Baton Rouge Police Department.

15.    At all times material to this action, Sheriff Gautreaux, Chief Paul, Mayor-President Broome, and the defendant officers acted under color of state law.

16.    The Defendants are liable jointly, severally, and *in solido* for the acts and omissions as forth in this Complaint and all resulting damages.

17.    This Complaint puts on notice any excess policy covering the EBRSO, Sheriff Gautreaux, BRPD, Chief Paul, Mayor-President Broome, the City/Parish, and any and all other Defendants.

## FACTUAL ALLEGATIONS

### I.    DEFENDANT OFFICERS' ACTIONS

### A.    The BRPD and/or EBRSO Receives a Report Concerning Deaughn Willis's Twin Brother, Keaughn.

18.    At 10:57 A.M. on January 8, 2022, S.C.[1] received a text message stating that her adult daughter, A.C., had been forcefully taken by Deaughn's twin brother, Keaughn Willis.

---

[1] Initials are being used because the names of S.C. and A.C. have not yet been publicly released in connection with any law enforcement investigation or related reports.

19.     Shortly after receiving this text message, S.C. placed a call to the 911 Operating System in East Baton Rouge Parish, repeating the text message and stating that her daughter was not at home or answering her phone.

20.     The 911 dispatch relayed that information to three unnamed officers, one of whom stated that A.C. "is a habitual runaway."

21.     Another officer stated that A.C.'s brother was tracking her phone, which indicated that she was then traveling on Airline Highway and was not at any stationary location.

22.     On information and belief, one or more officers arrived at A.C.'s residence to confirm whether S.C. or A.C. were there.

23.     Apart from S.C.'s text message, on information and belief, the only other information that the defendant officers had regarding A.C. was that an adult who is a habitual runaway was not at home or answering her phone.

### B.     Defendant Officers Create and Provoke a Violent Confrontation at Deaughn Willis's Residence Without a Warrant.

24.     At around 3:30 pm on January 8, 2022, at least five officers of the EBRSO and BRPD arrived in a tactical formation at Deaughn's residence, located at 15580 George O'Neal Road, Apartment # 1235, Baton Rouge, Louisiana 70817. Each officer was armed and wearing full tactical uniforms layered with bulletproof vests. An unnamed officer took position in front of the apartment door ("Officer Jane Doe"). Deputy Guillot, who, on information and belief, had military training as a sniper, followed closely behind with a military-style weapon. Two additional officers took position on the stairwell adjacent to the apartment while another officer approached the apartment door from the opposing stairwell. These officers concealed their identity as law enforcement officers by positioning themselves outside the view of the peephole of the apartment door.

25.    While these armed officers were positioning themselves outside the apartment, Deaughn was spending his first day off from a new job at a chemical plant by playing in the living room with his autistic younger brother, Jordan Wilson. Deaughn's other younger brother, S'rhen Wilson, was in the back of the apartment recovering from a recent leg surgery. Deaughn's mother, Trinelle Willis, was recovering from a recent surgery by resting in her bedroom. Deaughn's stepfather, Leonard Wilson, was cooking in the kitchen. However, neither Keaughn Willis nor A.C. were in the apartment, and the defendant officers had no legitimate reason to expect to find either of them there.

26.    In a calculated effort to surprise and alarm the apartment's occupants, Officer Jane Doe loudly and aggressively banged on the front door five times with her fist and forearm, causing the door to bow. Deputy Guillot commented on the forceful nature of the knocking, saying in a low voice, "Well, damn. They know it's the police now." Deputy Guillot then lifted his military-style weapon to his chest.

27.    Deputy Guillot was wrong. No one in the apartment knew that the defendant officers were law enforcement. At no point did the defendant officers announce who they were or why they were there. At no point did the defendant officers try to communicate with the residents of the apartment prior to arriving. All the defendant officers did was bang aggressively on the door with their weapons at the ready with the intent to frighten Deaughn and his family.

28.    Alarmed by the loud and aggressive banging, Leonard Wilson shouted, "Who is it?" The officers refused to respond. Officer Jane Doe then banged on the door another seven times. Again, Leonard Wilson shouted, "Who is it?" And again, the defendant officers refused to identify themselves. Terrified for the safety of her family, Deaughn's mother ushered her son Jordan to the back of the apartment while she prepared to dial 911.

29.    Getting no answers and unable to see who was outside, Deaughn approached the door. With his family hiding in the back of the apartment and his mother exclaiming that she was calling 911, Deaughn cautiously cracked open the door. Soon thereafter, shots rang out from outside the apartment, and Deaughn cried out that he had been shot.

30.    At no time prior to Deaughn's opening of the door did any occupants of the apartment know that law enforcement officers were on the other side of the door. At no time did any of the apartment's occupants pose a threat to the defendant officers. At no time during this encounter did Deaughn commit any criminal act or otherwise give the officers probable cause or reasonable suspicion that any criminal act had been committed.

31.    A nearby ring camera captured video of the events as they unfolded from the exterior of the residence ("Ring Camera Video"). (The Ring Camera Video does not record continuously and instead shows multiple segments.) After initially banging on the door, Officer Jane Doe advises the other officers that the residence is occupied and states, "Someone's in there." She then looks at Deputy Guillot and asks, "She stays here by herself?" Deputy Guillot shakes his head. This footage makes clear that Deputy Guillot's view of the door was partially obstructed by Officer Jane Doe.

32.    The Ring Camera Video subsequently depicts Deputy Guillot's firing his military-style weapon into the occupied residence, not knowing who was behind the door or how many people he might hit and kill. The apartment door is barely open, but nothing beyond the door can be seen.

33.    The total number of bullets fired by Deputy Guillot is unknown. What is known is that the bullets went through the door itself, striking Deaughn while he was completely inside his

family's home. Bullets struck Deaughn in the shoulder and head, inflicting wounds that would soon kill him.

34.    With Deaughn inside the apartment, no reasonable law enforcement officer could have concluded that he posed a threat to or intended to harm any of the defendant officers. Any reasonable officer would similarly have either retreated to assess the situation or taken other steps to de-escalate any dangerous situation that the defendant officers, themselves, had created.

35.    On the Ring Camera Video, shrieks can be heard as the apartment door closes. Several defendant officers retreat while the officer running down the adjacent stairwell announces, "shots fired." This officer, who was then closest to the door, asks Deputy Guillot, "He had a gun?" After Deputy Guillot answers, Officer Jane Doe asks, "Huh? He did?" The only firearms that can be seen from the Ring Camera Video are those belonging to the defendant officers.

36.    The Ring Camera Video subsequently depicts Officer Jane Doe—after retreating—emerge from the adjacent stairwell and again bang on the door. She instructs the occupants of the residence, "Quiet! Quiet! Quiet!" Then, and for the first time, Officer Jane Doe announces, "Sheriff's Office!" She then states, "If you are in there, step out one at a time." Additional shrieks can be heard from within the apartment, and Deaughn's mother can be heard saying, "Don't shoot at my family. We didn't do nothing wrong." An officer can be heard saying, "Wanda, where is she? Where's he at with the gun? Ask that!" Additional screaming can be heard from within the apartment. Officer Jane Doe then says, "Sheriff's Office! With your hands up, apartment 1235, step out!"

37.    At this point, and despite Deaughn bleeding on the floor from his gunshot wounds, the occupants comply with Officer Jane Doe's commands and begin to exit the apartment, showing that they would have cooperated with the defendant officers' commands had they announced

themselves in the first place. As the apartment door slowly opens, Officer Jane Doe commands the occupants to come out "one at a time" with their "hands up." Other officers begin shouting over each other. Leonard Wilson emerges from the apartment with his hands up and informs the officers that his "baby [is] on crutches. He just got an operation." The defendant officers usher him away from the residence and down the stairs. Officer Jane Doe then looks at another officer and confirms that he is going to "cover" her as she opens the apartment door. The Ring Camera Video ends.

38.     Deaughn lay bleeding from his gunshot wounds over forty-five minutes before dying. Deaughn's mother, who had experience as a nurse, attempted to give Deaughn emergency medical care to make sure he was not "bleeding out" from his gunshot wounds; however, the defendant officers prevented her from giving Deaughn any medical care and prevented her from attempting to save his life. Instead, they threatened her with arrest if she got any closer. She was not even permitted to place a towel on his wounds to mitigate the blood loss.

39.     One by one, Deaughn's mother and two brothers were forced to walk past Deaughn, who was barely breathing while still bleeding in front the door, before being detained in the back of the defendant officers' vehicles.

40.     After being detained, Deaughn's mother called again for the defendant officers to help stop the bleeding in another last-minute effort to save Deaughn's life, but the defendant officers refused. Instead, the defendant officers conducted a search of the apartment while ignoring Deaughn's body, still bleeding on the floor. Deaughn was later pronounced dead on the scene by the East Baton Rouge Parish Coroner's Office from the gunshot wounds inflicted by Deputy Guillot.

41.     At no point did any occupant provoke this senseless attack. None of the defendant officers had probable cause or reasonable suspicion to believe that anyone inside the apartment

had committed or was in the process of committing a crime. None of the defendant officers had a search warrant or arrest warrant. None of the defendant officers otherwise had probable cause to effect a search of the residence or detention or arrest of any of its occupants. Instead, the defendant officers engaged in aggressive and irresponsible behavior that prompted Deaughn's family to fear for their lives, retreat to a safe spot in their apartment, and call 911.

42.     Throughout this encounter, the defendant officers—all of whom were selected, trained, and employed by the EBRSO and/or BRPD—were acting under color of state law and in the course and scope of their employment as officers of the EBRSO and/or BRPD.

## II.     FACTUAL ALLEGATIONS SURROUNDING THE EBRSO'S EMPLOYMENT, TRAINING, SUPERVISION, AND DISCIPLINE OF DEFENDANT OFFICERS.

43.     East Baton Rouge Parish utilizes and employs its own sheriff's department: EBRSO. The Sheriff of East Baton Rouge Parish at all relevant times before, during, and after the incident giving rise to these allegations was Sheriff Gautreaux, making him the responsible decisionmaker and policymaker for the EBRSO. At all times material to this action, Sheriff Gautreaux was acting under color of state law.

44.     The shooting and killing of Deaughn Willis and other tortious conduct sued upon herein occurred in the Parish of East Baton Rouge and in the territorial jurisdiction of the EBRSO.

45.     In Sheriff Gautreaux's official capacity, he was and is responsible for adopting, implementing, promulgating, and enforcing policies, customs, and practices pertaining to making arrests and preserving peace in the Parish of East Baton Rouge.

46.     Additionally, Sheriff Gautreaux is responsible for the screening, hiring, disciplining, training, supervising, and retaining of the EBRSO's employees—including the defendant officers.

13

47.     Adequate screening, hiring, disciplining, training, supervising, and retaining of the EBRSO's employees are all necessary to ensure that each officer was and is qualified and properly trained to perform the duties and functions of a law enforcement officer, including preserving the peace, engaging with the public through socially responsible mechanisms, and the constitutional use of force.

48.     Based on the conduct of Deputy Eno Guillot and upon information and belief, Sheriff Gautreaux and the EBRSO did not properly examine and scrutinize the background of Deputy Guillot before hiring him.

49.     The Louisiana Supreme Court has previously suppressed evidence where Deputy Guillot violated a citizen's rights under the U.S. Constitution. *State v. Boyer*, 967 So. 2d 458, 473–74 (La. 2007) (finding that then-Officer Guillot's "search and seizure of the contraband did not meet the plain feel exception to the warrant requirement" and was not "justified as one incident to arrest"). In *Boyer*, it was also noted that then-Officer Guillot "forcibly took the defendant, who did not resist, to the ground" without "hav[ing] probable cause to arrest the defendant for the crime of resisting an officer." *Id.* at 475. This legal history indicates that Deputy Guillot posed a risk of violating the constitutional rights of third parties. Sheriff Gautreaux therefore showed a deliberate indifference to the rights of innocent third parties by failing to adequately screen Deputy Guillot before hiring him.

50.     Upon information and belief, Sheriff Gautreaux and the EBRSO also failed to properly train, supervise, and/or discipline Deputy Eno Guillot regarding proper law enforcement officer practices. These failures include failing to train Deputy Guillot with the proper method of interacting nonviolently with citizens, handling military-style weapons, and discharging his

military-style weapon in a method calculated not to subject an unknown number of innocent citizens to severe risk of death or serious bodily injury.

51.    Upon information and belief, in willful, reckless, and callous disregard for Deaughn's life and rights under federal and state law, Sheriff Gautreaux and the EBRSO also failed to properly train Deputy Eno Guillot in the constitutional use of force and responsible use of firearms.

52.    Sheriff Gautreaux and the EBRSO are liable for the following wrongful acts, including but not limited to:

a.  failing to properly hire, supervise, and train EBRSO deputies, including the defendant officers;

b.  failing to appropriately reprimand and discipline EBRSO deputies who engage in misconduct, thereby encouraging such conduct;

c.  failing to retrain and/or otherwise control EBRSO deputies who engage in excessive force and/or unjustified shootings of citizens;

d.  failing to adequately investigate complaints and allegations of excessive force and other misconduct by EBRSO deputies; and

e.  approving EBRSO deputies using their power and position to interfere with the rights of innocent citizens.

53.    Defendant Eno Guillot's extreme misconduct was a product of Sheriff Gautreaux's failure to adequately discipline officers. On information and belief, Deputy Guillot returned to duty the very next day following his reckless shooting and killing of Deaughn.

54.    Based on the extreme misconduct of the other defendant officers and upon information and belief, Sheriff Gautreaux and the EBRSO also failed to properly train, supervise,

or discipline defendant officers with regard to proper law enforcement officer practices. These failures include failing to train all defendant officers:

    a.   not to approach a residence in non-exigent circumstances with military-style weapons at the ready;

    b.   not to conceal their identity as law enforcement officers by positioning themselves outside the view of occupied residences in non-exigent circumstances;

    c.   not to unnecessarily increase the likelihood of a violent confrontation by aggressively banging on the door to occupied residences;

    d.   not to refuse to identify themselves when asked to do so;

    e.   not to permit the use of unnecessary and excessive force by fellow defendant officers; and

    f.   not to arbitrarily and unnecessarily prevent emergency medical care to gunshot victims.

55.    This custom, policy, practice, and pattern of recklessly endangering the lives and stripping the constitutional rights of citizens is evident from numerous cases.

56.    Blair Imani, Akeem Muhammad, Raae Pollard, Samantha Nichols, Tammy Cheney, Alexus Cheney, Victor Onuoha, Antonio Castanon Luna, Nadia Salazar Sandi, Karen Savage, Cherri Foytlin, Dr. Daniel Liebeskind, Alisha Feldman, Finn Phoenix, Leah Fishbein, Max Geller, Lisa Batiste-Swilley, Travis Day, and Lubin Gilbert were all subject to excessive force by EBRSO and/or BRPD employees in connection with an arrest during the protests held July 8-10, 2016, following the shooting and killing of Alton Sterling.

16

57.     On February 7, 2017, Corporal Leroy Griffin was working at the East Baton Rouge Readiness Academy when he observed two male students arguing. To prevent a fight, Corporal Griffin restrained Shaqualia Felder's 14-year-old cousin by punching him, slamming him to the ground, and handcuffing him. Ms. Felder asked Corporal Griffin why he was handling her cousin that way. Deputy Griffin then struck Ms. Felder in the face before detaining her and taking her to a juvenile detention center without first providing medical care to or seeking medical treatment for Ms. Felder.

58.     On August 10, 2017, Deputy Gaston Bourg gave his K-9 unit several commands to physically apprehend Anthony Haynes while Mr. Haynes was already in handcuffs and on the ground. The police report written in connection with this event provides that "Deputy Bourg failed to create enough distance between him, his K9, and the suspect causing his K9 to initially nip at the suspect." Deputy Bourg then "reacted by making a poor judgment decision giving his K9 the apprehension command while the suspect was on the ground."

59.     On March 14, 2018, Shermichael Ezeff approached Deputy Ronald Landry while Deputy Landry was serving papers at a nearby apartment complex. Mr. Ezeff was bleeding from an unknown incident and was seeking help because he was injured. Deputy Landry asked Mr. Ezeff if he was armed, and Mr. Ezeff said that he was not armed. Deputy Landry then commanded Mr. Ezeff to put his hands on a nearby fence. Mr. Ezeff moved to say something to Deputy Landry, and then Deputy Landry shot and killed Mr. Ezeff.

60.     On April 15, 2019, Deputy John Doe responded to a report of a "suspicious vehicle" parked in East Baton Rouge Parish that was occupied by Benjamine Chambers and Caleb Pitre. Deputy Doe then shot Mr. Chambers through the driver's side window, striking him in the face and neck. Deputy Doe then aggressively removed Mr. Chambers from the vehicle by his neck

and slammed him face first into an assortment of concrete, gravel, and broken glass. Mr. Chambers was not armed.

61.    On September 14, 2019, Melvin Watkins was attending a birthday celebration when he began a verbal disagreement that led to a guest calling 911 to have Mr. Watkins escorted from the residence. Mr. Watkins voluntarily left the party and began walking toward his parked car. Deputy James Morgan Hammett then arrived at the scene and briefly spoke with some of the guests who were standing nearby. As Mr. Watkins started to drive away, Deputy Hammett fired several shots through the windshield of Mr. Watkins's car, striking him in the chest. Mr. Watkins then lost control of his vehicle, and Deputy Hammett fired three more shots into Mr. Watkins from the driver's side of the vehicle. The vehicle struck a few mailboxes before flipping over and coming to rest in the front yard of a nearby home.

62.    On April 3, 2020, Bradford Skinner, a prisoner at the East Baton Rouge Work Release Facility, requested medical attention after developing symptoms consistent with COVID-19. However, he was only given ingredients to make herbal tea and was denied medical treatment. On April 4, 2020, Mr. Skinner again requested medical treatment but was denied and, instead, handcuffed by Officer Martin, a Louisiana Workforce, LLC employee, while Deputies Demarcus Braxton and Rudolph Hyde assisted. Deputy Braxton then maced Mr. Skinner in the face before forcibly bending Mr. Skinner over a railing until he lost consciousness. Deputy Braxton then wrote a disciplinary report charging Mr. Skinner with "aggravated disobedience."

63.    Deputy Braxton had been disciplined at least seven times prior to the incident with Mr. Skinner, each of which resulted in suspension.

64.    In 2012, Deputy Braxton was suspended after a colleague witnessed him repeatedly kicking and punching an inmate who was handcuffed and in the fetal position on the ground.

18

65.     Following Deputy Braxton's assault on Mr. Skinner, the EBRSO promoted him and gave him a raise. Soon afterward, video footage was released that depicted Deputy Braxton taunting a restrained inmate who was undergoing a medical evaluation. Subsequent video footage depicted the same inmate with a bloody face and appearing to have been "sprayed with subject control spray." Deputy Braxton refused to take this inmate to be seen by medical staff. Following the release of this footage, the EBRSO demoted Braxton back to a deputy. Despite this demotion, his subsequent performance review found Deputy Braxton to "meet[] standards" in every category, and Deputy Braxton was recommended for a performance-based pay raise.

66.     Based on the extreme misconduct of the defendant officers, on information and belief, Sheriff Gautreaux and the EBRSO also maintain policies, practices, customs, and patterns of endorsing and condoning the failure to provide adequate medical treatment when constitutionally required to do so. This custom, policy, practice, and pattern of failing to provide adequate medical attention to citizens who have been seized, detained, or arrested is evident from numerous cases.

67.     David O'Quin became an inmate at the East Baton Rouge Parish Prison ("EBRPP") on February 13, 2013, presenting erratic and bizarre behavior consistent with his bipolar disorder, schizo-affective disorder, and paranoid schizophrenia. Mr. O'Quin's behavior led prison staff to restrain him in a chair with metal handcuffs and shackles for up to one day at a time, which caused lacerations and bruising. During these periods, Mr. O'Quin was left "screaming and writhing and spitting" in his own waste. At no point did Mr. O'Quin receive adequate medical or psychiatric attention and was instead "left restrained in a chair, largely unmedicated, dehydrated, beaten and abused by prison guards until his death," which was the result of a "bacterial infection that seeped into his wounds." *O'Quin v. Gautreaux*, 2015 WL 1478194 at *1, *7 (M.D. La. March 31, 2015).

68.     On November 25, 2013, Douglas Herrin, who was detained in the EBRPP, made a "sick call" to inform prison staff that he had not received his epilepsy medication and also to request to see a physician after reporting that he was experiencing pre-seizure symptoms. The prison staff failed to call a doctor. Mr. Herrin was subsequently moved to general population and was assigned a top bunk. Mr. Herrin was not given his epilepsy medication or allowed to see a physician after this move. On November 26, 2013, Mr. Herrin again requested to see a physician and receive his medication because he felt a seizure coming on. Instead, the prison staff placed him on the floor in an isolation cell. Mr. Herrin was subsequently returned to his top bunk, at which point he advised prison staff once more of his pre-seizure symptoms and the need for his epilepsy medication, both of which requests were denied. Mr. Herrin then climbed to his top bunk and attempted to remain calm but instead suffered a grand mal seizure. Mr. Herrin fell to the floor, breaking his neck.

69.     From September 19, 2014 to November 12, 2014, Paul Cleveland was a detainee in the EBRPP. Despite a documented history of heart problems and other medical ailments, Mr. Cleveland was denied appropriate medical treatment when he presented symptoms consistent with a heart attack. Mr. Cleveland requested but was denied a wheelchair, stronger pain medications, and to visit a heart or vascular doctor. On November 10, 2014, Mr. Cleveland fainted after suffering from dizziness and nausea. Again, he requested a hospital visit related to his heart condition but was denied. The physician employed by the EBRPP testified that he did not believe that Mr. Cleveland was faking his symptoms but that he could not instruct any medical staff at the prison to call an ambulance because, according to his training, it was medical staff who was responsible for that decision. Mr. Cleveland died on November 12, 2014 from this failure to receive adequate medical treatment by EBRSO employees.

70.     On April 18, 2015, Randall Toler was arrested and then detained in the EBRPP, at which point he disclosed to prison staff that he was a diabetic. On April 20, 2015, Mr. Toler complained of nausea and was presented before the Commissioner, who requested that Mr. Toler be immediately sent to see a physician. However, no prison physician ever attended to Mr. Toler. He was returned to the prison's medical tank at 4:38 P.M. on April 20, but his condition continued to deteriorate until 6:00 P.M., when a physician found Mr. Toler on the floor unresponsive and discolored. Mr. Toler was pronounced dead at 7:04 P.M. on April 20, 2015 without having received adequate medical attention by EBRSO employees.

71.     On July 9, 2016, during a protest related to the shooting and killing of Alton Sterling, Brandon Erp was tackled by an officer wearing riot gear. Law enforcement officers dragged Mr. Erp across concrete, which caused rib injuries, as well as cuts and contusions to his chest, head, and other body parts. At no point did any officer provide or attempt to seek out medical treatment for Mr. Erp for his injuries, for which he subsequently sought medical treatment and continued to require medical treatment for at least one and a half years after this encounter. EBRSO officers participated in the arrest, detention, transportation, imprisonment, and denial of medical care of Mr. Erp.

72.     Similarly, on July 10, 2016, law enforcement officers threw Max Geller to the ground, subsequently slammed his head into the ground, held him down, and kicked him. EBRSO officers participated in the arrest, detention, transportation, imprisonment, and denial of medical care of Mr. Geller.

73.     Louis Fano, an inmate in the EBRPP, attempted suicide within hours of being placed in a dorm on November 1, 2016. After a brief period of suicide watch, prison medical staff determined that Mr. Fano was not suicidal, discontinued the suicide watch, and prescribed

medication for Mr. Fano's bipolar disorder. Although he was scheduled to see a psychiatrist on December 15, 2016 and January 3, 2017 and other physicians during December 2016–January 2017, these appointments did not occur. Two weeks prior to Mr. Fano's suicide, his antipsychotic medication was discontinued because prison staff doubted that Mr. Fano had serious mental illness. On February 2, 2017, Mr. Fano was found hanging from the bars of his cell and was declared dead three days later.

74.    As stated above, on August 10, 2017, Anthony Haynes suffered severe dog bite injuries caused by Deputy Bourg; however, the arresting officers refused to provide or seek out medical treatment for Mr. Haynes in retaliation for his alleged refusal to identify the other participants in the suspected crime.

75.    As stated above, on April 3-4, 2020, Bradford Skinner requested medical attention after developing symptoms consistent with COVID-19. The first day he requested medical treatment, he was only given ingredients to make herbal tea. When he requested medical treatment on the second day, he was maced and choked until he lost consciousness.

76.    These cases reflect a custom, policy, practice, and pattern of denying citizens who have been seized, detained, or arrested adequate medical attention.

77.    As a direct and proximate result of the conduct of Defendants, Dyaughna Willis has suffered and continues to suffer extraordinary damages, including financial losses, emotional distress, trauma, loss of enjoyment of life, loss of affection, psychological harm, and pain and suffering.

### III.    FACTUAL ALLEGATIONS SURROUNDING THE BRPD'S EMPLOYMENT, TRAINING, SUPERVISION, AND DISCIPLINE OF DEFENDANT OFFICERS.

78.    The City of Baton Rouge utilizes and employs its own police department: BRPD. The Chief at all relevant times before, during, and after the incident giving rise to these allegations was Chief Paul, making him the responsible decisionmaker and policymaker for the BRPD.

79.    In Chief Paul's official capacity, he was and is responsible for adopting, implementing, promulgating, and enforcing policies, customs, practices, and patterns pertaining to making arrests and preserving peace in the City of Baton Rouge.

80.    Additionally, Chief Paul is responsible for the screening, hiring, disciplining, training, supervising, and retaining of the BRPD's employees—including the defendant officers.

81.    Adequate screening, hiring, disciplining, training, supervising, and retaining of the BRPD's employees are all necessary to ensure that each officer was and is qualified and properly trained to perform the duties and functions of a law enforcement officer, including preserving the peace, engaging with the public through socially responsible mechanisms, and the constitutional use of force.

82.    Based on the extreme misconduct of defendant officers and upon information and belief, Chief Paul and the BRPD did not properly examine and scrutinize the background of defendant officers before hiring them.

83.    Based on the extreme misconduct of defendant officers and upon information and belief, Chief Paul and the BRPD also failed to properly train, supervise, and/or discipline defendant officers with regard to proper law enforcement officer practices. These failures include failing to train defendant officers:

23

    a.   not to approach a residence in non-exigent circumstances with military-style weapons at the ready;

    b.  not to conceal their identity as law enforcement officers by positioning themselves outside the view of occupied residences in non-exigent circumstances;

    c.  not to unnecessarily increase the likelihood of a violent confrontation by aggressively banging on occupied residences;

    d.  not to refuse to identify themselves when asked to do so;

    e.  not to permit the use of unnecessary and excessive force by fellow defendant officers; and

    f.  not to arbitrarily and unnecessarily prevent emergency medical care to gunshot victims.

84.    The BRPD's pattern of recklessly endangering the lives and stripping the constitutional rights of citizens is evident from the circumstances surrounding the injury and/or death of several citizens.

85.    On February 23, 2016, Sergeant Verner Budd and Detectives Scott Henning, Shannon Broussard, and Charles Montgomery fired around twenty shots at Travis Stevenson and his vehicle, despite that Mr. Stevenson had no weapon, was not attempting to escape, made no threats to anyone but himself, and was completely boxed in by the officers' vehicles.

86.    On July 5 2016, Baton Rouge police officers Howie Lake and Blaine Salamoni, responding to a call at the Triple S Food Market, encountered Alton Sterling, who was selling CDs outside the store. Although Mr. Sterling offered no resistance, the officers grabbed his neck, forced him onto the hood of a car, pointed a gun at him, threatened to "shoot [him] in [his] f***ing head,"

tased him, and ultimately shot him multiple times as he was pinned to the ground, killing him. The City of Baton Rouge ultimately paid $4.5 million to settle a lawsuit brought by Mr. Sterling's family.

87.     On June 13, 2017, Baton Rouge police officer Yuseff Hamadeh shot and killed Jordan Frazier as he was running away following a traffic stop. Although Officer Hamadeh claimed that he shot Mr. Frazier after Mr. Frazier had pointed a gun at him, an autopsy determined that Mr. Frazier was shot twice in the back and once in the leg. Rather than imposing any discipline on Officer Hamadeh, the BRPD awarded him the Medal of Valor for killing Mr. Frazier—even before the district attorney had concluded his review of the case.

88.     Approximately one year later, in August 2018, Officer Hamadeh shot at another man running away following a traffic stop. Officer Hamadeh pulled over Raheem Howard for a missing license plate, even though Mr. Howard had a temporary tag in his vehicle window. Officer Hamadeh crashed into Raheem Howard's vehicle while making the stop, then got out of his vehicle and stated: "I am going to f***ing kill you." As Mr. Howard ran away, Officer Hamadeh chased him, kicking in the door of a private residence in the process, and tried to shoot him.

89.     Officer Hamadeh claimed that Mr. Howard had shot at him first. However, Mr. Howard did not shoot at Officer Hamadeh, or even have a gun, and no evidence or witnesses indicated that he did. And, although Officer Hamadeh's body camera footage was not available because he did not turn on the camera, a recording from a nearby neighborhood surveillance camera confirmed that only one shot was fired. Nevertheless, Mr. Howard was charged with attempted first-degree murder of a police officer and was arrested after he turned himself in. Baton Rouge police officers tried to persuade him to admit that he had shot at Officer Hamadeh and even

claimed, falsely, that video from Officer Hamadeh's dash camera showed Mr. Howard holding a gun.

90.    Lubin Gilbert Nicole Smith, Sean Benjamin, Travis Day, Shonta Jackson on behalf of minor child A.R., Sofie Kosofsky, Leroy Tennart, Deon Tennart, Eddie Hughes, Godavari Hughes, Elcide Harris, Zachary Hill, Thomas Hutcherson, Blair Imani, Akeem Muhammad, Raae Pollard, Samantha Nichols, Tammy Cheney, Alexus Cheney, Victor Onuoha, Antonio Castanon Luna, Nadia Salazar Sandi, Karen Savage, Cherri Foytlin, Dr. Daniel Liebeskind, Alisha Feldman, Finn Phoenix, and Leah Fishbein were all subject to excessive force by BRPD and/or EBRSO officers in connection with an arrest during the protests held July 8-10, 2016 following the shooting and killing of Alton Sterling.

91.    On November 13, 2017, Officer Darrell Carter accompanied a caseworker from the Department of Children and Family Services to an apartment occupied by Calvin Toney. Mr. Toney tried to flee from Officer Carter and was tased multiple times. When Mr. Toney attempted to reach for Officer Carter's taser, the officer shot him in the chest. Mr. Toney tried to run again but was subdued and handcuffed. He died on the scene.

92.    In November 2017, Officer Marshall McDermitt responded to a call for assistance after a driver refused to stop. The driver crashed into a creek and began to flee the scene. Officer McDermitt repeatedly called the suspect a "b**ch" during the chase and told another officer to "tase the f***ing b**ch."

93.    Despite this history, Chief Paul suspended Officer McDermitt for only two days in 2018 due to what he called "a pattern of behavior [that] may violate department policy."

94.    Roughly one year after returning to the BRPD, on April 7, 2019, Officer McDermitt responded to a call from employees of a bar, where an altercation had broken out between several

bar employees and a friend of Mark Patterson. One of the bar employees knocked Mr. Patterson's friend unconscious. Officer McDermitt arrived at the scene and, after attempting to separate Mr. Patterson from the crowd, partially handcuffed Mr. Patterson. Officer McDermitt then attempted to tackle Mr. Patterson to the ground, but Mr. Patterson held tightly to a nearby vehicle. Officer McDermitt then struck Mr. Patterson in the face multiple times in rapid succession while Mr. Patterson was partially handcuffed. Mr. Patterson's injuries included a deviated septum and broken teeth, the former of which required facial plastic reconstructive surgery. Mr. Patterson suffers ongoing neurological damage due to a closed brain injury.

95.     In January 2020, during a pretextual traffic stop, Officer Ken Camallo and another officer strip-searched Clarence Green and his 16-year-old brother in public view. The officers then proceeded to Mr. Green's apartment. With no warrant, no permission, and no exigent circumstances, they entered the apartment with guns drawn on the pretext of conducting a "welfare check" and searched the apartment.

96.     Mr. Green was later prosecuted for firearm possession based on a gun found during the traffic stop. In its order dismissing the indictment, the court explained that "the state agents in this case demonstrated a serious and wanton disregard for [Mr. Green's] constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading [his] home (weapons drawn) to conduct an unjustified, warrantless search. Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution, which protects citizens against unwarranted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63." Order, *United States v. Green*, No. 20-CR-46-BAJ-SDJ (M.D. La. Dec. 29, 2020), Doc. 35 at 1, n.1.

97.    As a direct and proximate result of the conduct of Defendants, Dyaughna Willis has suffered and continues to suffer extraordinary damages, including financial losses, emotional distress, trauma, loss of enjoyment of life, loss of affection, psychological harm, and pain and suffering.

## FEDERAL LAW CAUSES OF ACTION

### COUNT I – THE DEFENDANT OFFICERS ARE LIABLE UNDER 42 U.S.C. § 1983 FOR THEIR UNLAWFUL SEIZURE OF DEAUGHN WILLIS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS.

98.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

99.    Deputy Guillot's shooting applied physical force to Deaughn's body and objectively manifested an intent to restrain him.

100.    This conduct constitutes a *per se* seizure under the Fourth and Fourteenth Amendments in deprivation of Deaughn's rights.

101.    The Fourth Amendment of the U.S. Constitution protects citizens against unreasonable searches and seizures.

102.    The Fourteenth Amendment of the U.S. Constitution protects citizens against the deprivation of life, liberty, or property without due process of law.

103.    A warrantless search or seizure is *per se* unreasonable absent an exception.

104.    It was clearly established at the time that Deputy Guillot seized Deaughn that the Fourth and Fourteenth Amendments prohibit law enforcement officers from unreasonable seizures.

105.    The seizure of Deaughn was objectively unreasonable in light of the circumstances and therefore violated Deaughn's Fourth Amendment rights.

28

106.    The seizure of Deaughn was willful, outrageous, reckless, and flagrant misconduct that showed deliberate indifference to Deaughn's rights under the Fourth and Fourteenth Amendments.

107.    The seizure of Deaughn was objectively unreasonable because:

    a.  neither Deaughn nor anyone else in the apartment had committed or were in the processing of committing any crime when the defendant officers arrived at the apartment;

    b.  the defendant officers had no probable cause or reasonable suspicion to believe that Deaughn or anyone else in the apartment had committed or were in the processing of committing any crime when the defendant officers arrived at the apartment;

    c.  the defendant officers had negligently and unlawfully created the situation resulting in the seizure;

    d.  neither Deaughn nor anyone else in the apartment posed any threat to the defendant officers or anyone else;

    e.  neither Deaughn nor anyone else in the apartment had ever exhibited any intent to harm any of the defendant officers or anyone else;

    f.  neither Deaughn nor anyone else in the apartment had any reason to expect to see the defendant officers or any law enforcement officer outside the apartment door when Deaughn cracked it open;

    g.  any violent confrontation between the defendant officers and Deaughn was directly caused by the defendant officers' own tortious, unlawful, and outrageous conduct;

    h.   no warning was ever given before creating the circumstances that foreseeably led to the defendant officers' excessive and deadly use of force; and

    i.   none of the defendant officers took any steps to de-escalate the situation or to intervene and protect Deaughn from the objectively unreasonable seizure.

108.   Any reasonable law enforcement officer would have known that seizing Deaughn would violate his clearly established constitutional rights.

109.   The seizure of Deaughn was the direct and proximate cause of the defendant officers' objectively unreasonable conduct.

110.   Each of the defendant officers was present at the scene when Deaughn was shot, knew that a fellow officer was violating Deaughn's constitutional rights by effecting an illegal seizure, and had a reasonable opportunity to prevent the harm. Each of the defendant officers chose, however, not to take any reasonable measure to prevent this illegal seizure. This knowing failure to intervene constitutes acquiescence in the violation of Deaughn's rights, rendering each officer liable under the theory of bystander liability.

111.   The defendant officers are not entitled to qualified immunity for their actions and inactions surrounding the unlawful seizure of Deaughn because their conduct violated Deaughn's clearly established constitutional rights and was objectively unreasonable under the circumstances.

112.   The seizure of Deaughn was exerted with malice and a reckless and callous indifference to Deaughn's rights under the U.S. Constitution, rendering the Defendants liable for punitive damages under 42 U.S.C. § 1983, in addition to all other damages owed as a result of the defendant officers' unconstitutional seizure of Deaughn.

## COUNT II – THE DEFENDANT OFFICERS ARE LIABLE UNDER 42 U.S.C. § 1983 FOR THEIR EXCESSIVE USE OF FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS.

113.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

114.    The Fourth Amendment of the U.S. Constitution protects citizens against excessive use of force by law enforcement officers.

115.    The Fourteenth Amendment of the U.S. Constitution protects citizens against the deprivation of life, liberty, or property without due process of law.

116.    It was clearly established at the time that Deputy Guillot shot and killed Deaughn that the Fourth and Fourteenth Amendments prohibit law enforcement officers from using force that is excessive or unreasonable under the circumstances.

117.    The excessive use of force against Deaughn was objectively unreasonable under the circumstances and therefore violated Deaughn's Fourth Amendment rights.

118.    The defendant officers' actions and use of excessive force were willful, outrageous, reckless, and flagrant misconduct that showed deliberate indifference to Deaughn's rights under the Fourth and Fourteenth Amendments.

119.    The use of any force was objectively unreasonable because:

    a.  neither Deaughn nor anyone else in the apartment had committed or were in the processing of committing any crime when the defendant officers arrived at the apartment;

    b.  the defendant officers had no probable cause or reasonable suspicion to believe that Deaughn or anyone else in the apartment had committed or were in the

processing of committing any crime when the defendant officers arrived at the apartment;

c.  the defendant officers had negligently and unlawfully created the situation resulting in the use of excessive and deadly force; and

d.  neither Deaughn nor anyone else in the apartment posed any threat to the defendant officers or anyone else.

120.  The use of <u>deadly</u> force against Deaughn was objectively unreasonable because:

a.  neither Deaughn nor anyone else in the apartment had ever exhibited any intent to harm any of the defendant officers or anyone else;

b.  neither Deaughn nor anyone else in the apartment had any reason to expect to see the defendant officers or any law enforcement officer outside the apartment door when he opened it;

c.  any violent confrontation between the defendant officers and Deaughn was directly caused by the defendant officers' own tortious, unlawful, and outrageous conduct;

d.  reasonable alternatives were available instead of the use of deadly force;

e.  firing a military-style weapon into an apartment known to be occupied by citizens was *per se* unreasonable and an excessive use of force under the circumstances;

f.  no warning was ever given before creating the circumstances that foreseeably led to the excessive and deadly use of force; and

g. none of the defendant officers took any steps to de-escalate the situation or to intervene and protect Deaughn from the objectively unreasonable and excessive force exerted by Deputy Guillot.

121.    Any reasonable law enforcement officer would have known that using excessive and deadly force against Deaughn would violate his clearly established constitutional rights.

122.    Firing a military-style weapon into an apartment known to be occupied by citizens was an act of objectively unreasonable, excessive, and deadly force that violated Deaughn's rights under the U.S. Constitution.

123.    The shooting and death of Deaughn was the direct and proximate cause of the defendant officers' objectively unreasonable conduct.

124.    The defendant officers are not entitled to qualified immunity for their actions and inactions surrounding the shooting and death of Deaughn because their conduct, including their use of excessive force against Deaughn, violated Deaughn's clearly established constitutional rights and was objectively unreasonable under the circumstances.

125.    Each of the defendant officers was present at the scene when Deaughn was shot and killed, knew that a fellow officer was violating Deaughn's constitutional rights through the use of excessive force under the circumstances, and had a reasonable opportunity to prevent the harm. Each of the defendant officers chose, however, not to take any reasonable measure to prevent the use of excessive force against Deaughn. This knowing failure to intervene constitutes acquiescence in the violation of Deaughn's rights, rendering each officer liable under the theory of bystander liability.

126.    The excessive use of force by Deputy Guillot and the other defendant officers was exerted with malice and a reckless and callous indifference to Deaughn's rights under the U.S.

Constitution, rendering the Defendants liable for punitive damages under 42 U.S.C. § 1983, in addition to all other damages owed as a result of the unreasonable and excessive force exercised against Deaughn.

**COUNT III – THE DEFENDANT OFFICERS ARE LIABLE UNDER 42 U.S.C. § 1983 FOR THEIR FAILURE TO RENDER MEDICAL CARE TO DEAUGHN WILLIS AFTER SHOOTING HIM.**

127.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

128.    The Fourteenth Amendment of the U.S. Constitution protects citizens against the deprivation of life, liberty, or property without due process of law.

129.    This right to due process requires that the state provide medical care to persons who have been injured while being apprehended, seized, detained, or arrested by a public law enforcement officer.

130.    The defendant officers denied Deaughn medical care by refusing to provide him with medical care, ignoring his family's pleas that he receive medical treatment, and refusing to contact emergency medical services within a reasonable time—which delay resulted in substantial harm and death.

131.    The defendant officers' failure to render medical care to Deaughn or contact emergency medical services violated his rights under the U.S. Constitution.

132.    Further, the defendant officers forced Deaughn's mother—who had experience as a nurse—to stop rendering emergency medical care to Deaughn.

133.    The defendant officers are not entitled to qualified immunity for their actions and inactions surrounding the failure to provide and refusal to permit medical care because their

conduct violated Deaughn's clearly established constitutional rights and was objectively unreasonable under the circumstances.

134.    Each of the defendant officers was present at the scene when Deaughn was denied medical treatment, knew that a fellow officer was violating Deaughn's constitutional rights through the denial of medical treatment, and had a reasonable opportunity to prevent the harm. Each of the defendant officers chose, however, not to take any reasonable measure to provide medical treatment to Deaughn or otherwise allow him to receive medical treatment. This knowing failure to intervene constitutes acquiescence in the violation of Deaughn's rights, rendering each officer liable under the theory of bystander liability.

135.    The defendant officers displayed malice and a callous and deliberate indifference to Deaughn's serious need for medical treatment, rendering the defendant officers liable for punitive damages under 42 U.S.C. § 1983, in addition to all other damages owed as a result of the defendant officers' failure to render medical treatment to Deaughn after shooting him and preclusion of medical care by a person with nursing experience.

### COUNT IV – SHERIFF GAUTREAUX IS LIABLE UNDER 42 U.S.C. § 1983 IN HIS OFFICIAL CAPACITY FOR HIS INADEQUATE SCREENING AND NEGLIGENT HIRING OF DEPUTY GUILLOT.

136.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

137.    Sheriff Gautreaux, in his official capacity, violated Deaughn's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by directly and proximately causing his shooting and death due to the failure to adequately screen the EBRSO's employees—including the defendant officers—showing a deliberate indifference to the substantial risk that a violation of the civil rights of a third party will occur.

138.    The defendant officers' shooting and killing of Deaughn is the direct and proximate result of Sheriff Gautreaux's failure to adequately screen the EBRSO's employees—including the defendant officers.

139.    Sheriff Gautreaux displayed deliberate indifference by failing to scrutinize Deputy Guillot's background, including the actions documented in *State v. Boyer*, 967 So. 2d 458, 475 (La. 2007). Adequate scrutiny would have led a reasonable supervisor to conclude that the plainly obvious consequence of deciding to hire Deputy Guillot would be the deprivation of a third party's constitutional rights.

140.    Sheriff Gautreaux and the EBRSO also have a custom, policy, practice, and pattern of failing to adequately screen their employees, further showing a deliberate indifference to the substantial risk that a violation of the civil rights of a third party will occur.

141.    Examples include but are not limited to Officer John Doe,[2] Captain Johnny Scott,[3] and Deputy Guillot.[4]

142.    In each of these cases, one or more EBRSO employees was improperly screened for hire.

143.    These examples implicate a custom, policy, practice, and pattern of failing to adequately screen employees for hire.

144.    Sheriff Gautreaux is therefore liable for a custom, policy, practice, and pattern of failing to adequately screen employees—including the inadequate screening of Deputy Guillot—which directly and proximately resulted in the use of excessive and deadly force against Deaughn.

---

[2] *See* Complaint, *Chambers v. Gautreaux*, No. 20-cv-00428 (M.D. La. July 6, 2020), ¶ 23.
[3] *See Stewart v. Gautreaux*, 2013 WL 2286103, at *1, *5 (M.D. La. May 21, 2013).
[4] *See State v. Boyer*, 967 So. 2d 458, 473–75 (La. 2007).

**COUNT V – SHERIFF GAUTREAUX IS LIABLE UNDER 42 U.S.C. § 1983 IN HIS OFFICIAL CAPACITY FOR HIS DELIBERATE INDIFFERENCE IN FAILING TO PROVIDE ADEQUATE TRAINING, SUPERVISION, OR DISCIPLINE TO THE EBRSO'S EMPLOYEES—INCLUDING THE DEFENDANT OFFICERS.**

145.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

146.    Sheriff Gautreaux and the EBRSO violated Deaughn's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by directly and proximately causing his shooting and death due to their failure to train, supervise, and discipline their employees—including the defendant officers—as necessary to prevent constitutional violations such as those committed here by the Defendants.

147.    The defendant officers' shooting and killing of Deaughn is the direct and proximate result of a custom, policy, practice, and pattern of Sheriff Gautreaux and the EBRSO of failing to train, supervise, and discipline their employees—including the defendant officers.

148.    This custom, policy, practice, and pattern is further evident from the numerous cases discussed above in which EBRSO employees used excessive force.

149.    In each of these cases, one or more EBRSO employees exerted excessive force under the circumstances in reckless disregard of the civil rights of their victims.

150.    This custom, policy, practice, and pattern is even further evident from the numerous cases discussed above in which Sheriff Gautreaux and the EBRSO have inadequately disciplined deputies for the use of excessive force.

151.    Each of these officers returned to active duty without an adequate "cool off" period of administrative leave.

152.    These examples implicate a custom, policy, practice, and pattern of failing to adequately train, supervise, and discipline employees following an excessive use of force.

153.    Sheriff Gautreaux is therefore liable for this custom, policy, practice, and pattern that directly and proximately resulted in the use of excessive and deadly force against Deaughn.

**COUNT VI – SHERIFF GAUTREAUX IS LIABLE UNDER 42 U.S.C. § 1983 IN HIS OFFICIAL CAPACITY FOR HIS DELIBERATE INDIFFERENCE IN MAINTAINING AND ENDORSING POLICIES, CUSTOMS, AND PRACTICES THAT CONDONE AND ENCOURAGE THE UNLAWFUL USE OF EXCESSIVE FORCE.**

154.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

155.    Sheriff Gautreaux and the EBRSO violated Deaughn's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by directly and proximately causing the shooting and killing of Deaughn due to their maintenance and endorsement of policies, customs, and practices that condone and encourage the unlawful use of excessive force and unlawful use of deadly force under the circumstances.

156.    The defendant officers' shooting and killing of Deaughn is the direct and proximate result of a custom, policy, practice, and pattern of condoning and encouraging the unlawful use of force and unlawful use of deadly force.

157.    This custom, policy, practice, and pattern is evident from the numerous cases discussed above in which EBRSO employees unlawfully used excessive force.

158.    In each of these cases, one or more EBRSO employees exerted excessive force in reckless disregard of the civil rights of their victims.

159.    Sheriff Gautreaux is therefore liable for this custom, policy, practice, and pattern that directly and proximately resulted in the use of excessive and deadly force against Deaughn.

**COUNT VII – SHERIFF GAUTREAUX IS LIABLE UNDER 42 U.S.C. § 1983 IN HIS OFFICIAL CAPACITY FOR HIS DELIBERATE INDIFFERENCE IN MAINTAINING AND ENDORSING POLICIES, CUSTOMS, AND PRACTICES THAT CONDONE AND ENCOURAGE THE UNLAWFUL FAILURE TO PROVIDE MEDICAL ATTENTION TO CITIZENS WHO HAVE BEEN SEIZED, DETAINED, OR ARRESTED.**

160.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

161.    Sheriff Gautreaux and the EBRSO violated Deaughn's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by directly and proximately increasing the likelihood that Deaughn's gunshot wounds would result in death due to their maintenance and endorsement of policies that condone and encourage the unlawful failure to provide adequate medical attention to citizens who have been seized, detained, or arrested.

162.    The defendant officers' failure and refusal to provide medical attention to Deaughn after shooting him is the direct and proximate result of a custom, policy, practice, and pattern of denying adequate medical treatment to citizens who have been seized, detained, or arrested.

163.    This custom, policy, practice, and pattern is evident from the numerous cases discussed above in which Sheriff Gautreaux and the EBRSO have been accused of failing to provide adequate medical attention to citizens who have been seized, detained, or arrested.

164.    In each of these cases, one or more EBRSO employees failed to provide adequate medical treatment when constitutionally required to do so.

165.    This case history implicates a custom, policy, practice, and pattern of failing to provide adequate medical treatment when constitutionally required to do so.

166.    Sheriff Gautreaux is therefore liable for this custom, policy, practice, and pattern that directly and proximately caused the defendant officers' failure to provide and refusal to permit emergency medical treatment when constitutionally required to do so.

**COUNT VIII – CHIEF PAUL AND MAYOR-PRESIDENT BROOME, IN THEIR OFFICIAL CAPACITIES, AND THE CITY/PARISH ARE LIABLE UNDER 42 U.S.C. § 1983 FOR THEIR DELIBERATE INDIFFERENCE IN MAINTAINING AND ENDORSING POLICIES, CUSTOMS, AND PRACTICES THAT CONDONE AND ENCOURAGE THE UNLAWFUL USE OF EXCESSIVE FORCE.**

167.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

168.    Chief Paul and the BRPD violated Deaughn's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by directly and proximately causing the shooting and killing of Deaughn due to their failure to provide adequate training, as well as their maintenance and endorsement of policies, customs, practices, and patterns that condone and encourage the unlawful use of excessive force and unlawful use of deadly force under the circumstances.

169.    The defendant officers' shooting and killing of Deaughn is the direct and proximate result of a failure to provide adequate training, supervision, and discipline, as well as a custom, policy, practice, and pattern of condoning and encouraging the unlawful use of force and unlawful use of deadly force under the circumstances.

170.    This failure to provide adequate training, supervision, and discipline, as well as a custom, policy, practice, and pattern of encouraging the unlawful use of excessive force is evident from the numerous cases discussed above in which Chief Paul and the BRPD have unlawfully used excessive force and unlawfully used deadly force.

171.    In each of these cases, one or more BRPD officers exerted excessive force under the circumstances in reckless disregard of the civil rights of their victims.

40

172. This case history implicates a failure to provide adequate training, as well as a custom, policy, practice, and pattern of condoning and encouraging the unlawful use of excessive force under the circumstances.

173. Chief Paul, Mayor-President Broome, and the City/Parish are therefore liable for this custom, policy, practice, and pattern that directly and proximately resulted in the use of excessive and deadly force against Deaughn.

### COUNT IX – DECLARATORY RELIEF/ACTION UNDER LA. CIV. CODE ART. 197

174. Pursuant to Fed. R. Civ. Proc. 57 and the Court's authority under 28 U.S.C. § 2201, Plaintiff respectfully requests that the Court, in accordance with Louisiana Civil Code articles 196 and 197 and other authorities, enter a judicial declaration of paternity and filiation, confirming that Dyaughna Asia Willis is the child of Deaughn Asian Willis.

### LOUISIANA LAW CAUSES OF ACTION

### COUNT X – NEGLIGENCE UNDER LOUISIANA LAW
### AGAINST ALL DEFENDANTS

175. Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

176. Plaintiff avers that Defendants are liable for damages pursuant to Louisiana Civil Code Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

177. Plaintiff also avers that the Defendants are liable for damages pursuant to Louisiana Civil Code Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

178. The defendant officers owed not only the duty of ordinary care embodied in Articles 2315 and 2316 of the Louisiana Civil Code, but also a specific duty under Louisiana Code of

Criminal Procedure Article 218 to inform any person to be arrested or detained of the officer's intentions, authority, and the cause of the arrest or detention.

179.    The defendant officers also owed a specific duty under Louisiana Code of Criminal Procedure Article 220 to only use reasonable force in effecting any arrest or detention or in overcoming any resistance or threatened resistance of a person being arrested or detained.

180.    The defendant officers owed these specific statutory duties regardless of the existence of any warrant and regardless of whether they were conducting a search or an arrest.

181.    The defendant officers also had a specific duty to conform their conduct to that of a reasonable law enforcement officer under the circumstances.

182.    The defendant officers had a specific duty to conduct investigations in such a way as to avoid an unreasonable risk of harm to citizens, including Deaughn and his family.

183.    The defendant officers had a specific duty not to provoke a violent encounter with residential occupants terrified of the defendant officers, who had concealed their identities as law enforcement officers and refused to identify themselves when asked to do so.

184.    The defendant officers had a specific duty not to use excessive force under the circumstances.

185.    The defendant officers had a specific duty not to unnecessarily endanger human life by firing a military-style weapon into an occupied residence.

186.    The defendant officers had a specific duty not to shoot and kill Deaughn.

187.    The defendant officers had a specific duty to provide medical care to Deaughn after shooting him.

188.    At the time of the shooting, any reasonable officer employed by the EBRSO or BRPD, exercising their function as law enforcement officers, would have announced their

presence and identity as law enforcement officers while conducting a wellness check on an adult "habitual runaway" in non-exigent circumstances.

189.    At the time of the shooting, any reasonable officer employed by the EBRSO or BRPD, exercising their function as law enforcement officers, would not have used deadly force because of the circumstances surrounding this incident.

190.    The defendant officers knew or should have known that approaching a residence in non-exigent circumstances with military-style weapons unnecessarily increases the likelihood of a violent confrontation.

191.    The defendant officers knew or should have known that concealing their identity as law enforcement officers by positioning themselves outside the view of the apartment door's peephole unnecessarily increases the likelihood of a violent confrontation.

192.    The defendant officers knew or should have known that aggressively banging on a residential door unnecessarily increases the likelihood of a violent confrontation.

193.    The defendant officers knew or should have known that refusing to identify themselves when asked to do so unnecessarily increases the likelihood of a violent confrontation.

194.    The defendant officers knew or should have known that the use of unnecessary and excessive force increases the likelihood of great bodily harm and injury to innocent citizens.

195.    The defendant officers knew or should have known that preventing a person with nursing experience from providing emergency medical care to a gunshot victim dramatically increases the likelihood of death from the victim's gunshot wounds.

196.    The defendant officers breached their duties of care in the following non-exclusive ways:

    a.   carrying military-style weapons to conduct a wellness check without a warrant in non-exigent circumstances;

    b.   concealing their identity as law enforcement officers by positioning themselves outside the view of the apartment door's peephole;

    c.   escalating the likelihood of a violent confrontation through aggressive banging on the door of a residence known to be occupied by citizens;

    d.   aggressively banging on a residential door without announcing their identity as law enforcement officers;

    e.   refusing to identify themselves when asked to do so by the residential occupants who may have suspected that the defendant officers were home intruders;

    f.   failing to take proper preventative measures and/or safeguards to avoid the likelihood of a violent confrontation;

    g.   failing to use de-escalation tactics to gain control of the situation, including but not limited to verbal conflict resolution, calling for back up, reporting the incident to a supervisor, and any and all other acceptable law enforcement tactics short of deadly force;

    h.   firing a military-style weapon into a private residence with an unknown number of occupants;

    i.   using excessive and deadly force under the circumstances;

    j.   failing to use less-lethal force under the circumstances;

k.  shooting and fatally wounding Deaughn;

l.  failing to operate strictly in compliance with Louisiana rules and regulations governing the use of force by law enforcement officers;

m.  prohibiting a witness with medical training and experience from providing emergency medical care to a gunshot victim;

n.  failing to timely or adequately provide emergency medical treatment to a gunshot victim when begged to do so;

o.  failing to conform their conduct to the standard of care of a reasonable law enforcement officer under the circumstances; and

p.  failing to conform their conduct to the standards of care laid out in Louisiana jurisprudence and the Louisiana Code of Criminal Procedure.

197.    Deaughn did not immediately die; he continued to suffer for over forty-five minutes from the gunshot wounds inflicted by Deputy Guillot.

198.    The defendant officers failed to render any sort of emergency medical treatment or first-aid, including failing to make attempts to stop the bleeding and failing to use resuscitative measures.

199.    Deaughn lay mortally wounded in his apartment for over forty-five minutes before emergency medical services were called and able to attempt treatment.

200.    Further, the defendant officers prevented a mother with nursing training from providing emergency medical care, including preventing her from placing towels on Deaughn's wounds in an effort to prevent him from bleeding out and save his life.

## COUNT XI – ASSAULT AND BATTERY UNDER LOUISIANA LAW
## AGAINST DEPUTY GUILLOT

201.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

202.    Louisiana jurisprudence provides that any force imposed in connection with an unlawful arrest or detention of a citizen constitutes a battery on that citizen, thereby entitling the victim to recover damages if injured.

203.    Deputy Guillot intentionally shot Deaughn.

204.    In the alternative, Deputy Guillot intended to shoot his military-style weapon into Deaughn's home.

205.    Deputy Guillot knew with substantial certainty that firing his military-style weapon into a residence that he knew was occupied greatly increased the likelihood of great bodily harm or injury to the occupants of the residence.

206.    Deputy Guillot did in fact fire his military-style weapon multiple times into Deaughn's home.

207.    Deputy Guillot did in fact shoot Deaughn in the shoulder and the head.

208.    As a direct and proximate result of Deputy Guillot's intentionally firing his military-style weapon into Deaughn's home, Deaughn was shot several times and subsequently died from the gunshot wounds inflicted by Deputy Guillot.

## COUNT XII – ABUSE OF PROCESS UNDER LOUISIANA LAW
## AGAINST THE DEFENDANT OFFICERS

209.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

46

210.    The defendant officers were lawfully permitted to <u>knock</u> "on the front door" because such knocking "is treated as an invitation or license to attempt an entry, justifying ingress of the home by solicitors, hawkers and peddlers of all kinds." *Florida v. Jardines*, 569 U.S. 1, 9 (2013). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. . . . Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* (citations and quotations omitted).

211.    However, the defendant officers' license to "knock promptly" and "wait briefly to be received" does not extend to aggressively banging 12 times on the front door while concealing their identity and refusing to identify themselves when asked to do so by the apartment's occupants.

212.    The defendant officers' failure to identify themselves and the residents' refusal to answer the door absent identification revoked any invitation or license the defendant officers had to remain on the premises absent exigent circumstances or a warrant.

213.    This surprise attack thus constitutes an abuse of process to unlawfully search the apartment and seize, detain, and/or arrest its occupants without a warrant.

214.    The defendant officers had the ulterior purpose of illegally effecting a search, seizure, detention, and/or arrest without getting a warrant or otherwise subjecting themselves to judicial oversight because they knew or had reason to know that no warrant would have been granted under these circumstances.

215.    This ulterior purpose is evident from (1) the defendant officers' willful appearance in an abundant show of force; (2) absence of a warrant authorizing them to search the apartment

or seize, detain, and/or arrest any of its occupants; and (3) ultimate illegal search of the apartment and detention of its occupants.

216.    The defendant officers executed willful acts in the use of process that was not proper in the regular prosecution of the proceedings.

217.    These willful acts included, but are not limited to, refusing to identify themselves as law enforcement officers when arriving at the apartment, concealing their identities by positioning themselves outside the view of the peephole of the apartment door, aggressively banging on the apartment door (a practice not authorized by custom), and refusing to identify themselves as law enforcement officers when asked to do so by the apartment's occupants.

218.    The defendant officers' abuse of process caused Dyaughna Willis to suffer damages.

### COUNT XIII – VICARIOUS LIABILITY UNDER LOUISIANA LAW AGAINST SHERIFF GAUTREAUX, CHIEF PAUL, MAYOR-PRESIDENT BROOME, AND THE CITY/PARISH

219.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

220.    Plaintiff avers that Sheriff Gautreaux, Chief Paul, Mayor-President Broome, in their official capacities, and the City/Parish are liable pursuant to Louisiana Civil Code Article 2317, which provides that individuals "are responsible, not only for the damage occasioned by [their] own act[s], but for that which is caused by the act of persons for whom [they] are answerable, or of the things which [they] have in [their] custody."

221.    Plaintiff also avers that Sheriff Gautreaux, Chief Paul, Mayor-President Broome, and the City/Parish are liable pursuant to Louisiana Civil Code Article 2320, which provides that an employer may be vicariously liable for the actions of their employees.

222.    Plaintiff avers that Sheriff Gautreaux, Chief Paul, Mayor-President Broome, and the City/Parish are liable pursuant to La. R.S. 42:1441.3, which provides that municipalities are responsible for the actions, offenses, and torts of their elected or appointed public officers, officials, deputy officials, or employees.

223.    Each of the defendant officers was selected, trained, and employed by the EBRSO and/or BRPD.

224.    Throughout the confrontation giving rise to these allegations, all defendant officers were acting under color of state law and in the course and scope of their employment as law enforcement officers of the EBRSO and/or BRPD.

225.    Sheriff Gautreaux, Chief Paul, Mayor-President Broome, and the City/Parish, as the employers of the defendant officers, are thus liable for the defendant officers' tortious conduct and violations of Deaughn's rights under the U.S. and Louisiana Constitutions.

226.    The defendant officers for whom Sheriff Gautreaux, Chief Paul, Mayor-President Broome, and the City/Parish are liable are the individual defendant officers named herein and all others who participated in the planning and/or assault upon Deaughn's family's apartment on January 8, 2022.

## COUNT XIV – VIOLATION OF ARTICLE I, § 2 OF THE LOUISIANA STATE CONSTITUTION AGAINST ALL DEFENDANTS

227.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

228.    Plaintiff avers that the Defendants are liable pursuant to Article I, § 2 of the Louisiana State Constitution, which provides that "[n]o person shall be deprived of life, liberty, or property except by due process of law."

## COUNT XV – INSURANCE COVERAGE

229.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

230.    Defendant American Alternative Insurance Corporation is an insurance company authorized to do and/or doing business in the Parish of East Baton Rouge, State of Louisiana and subject to the jurisdiction of this Honorable Court, which, on information and belief, at all times material to this action, provided policies of liability insurance to Sheriff Sidney J. Gautreaux, III and/or the EBRSO, which policies provide coverage for the claims and damages asserted herein. American Alternative Insurance Corporation, as the insurer for Sheriff Gautreaux and/or the EBRSO, is liable jointly, severally, and *in solido* with Sheriff Gautreaux and/or the EBRSO pursuant to Louisiana's Direct Action Statute, La. R.S. 22:1269.

231.    Defendant XYZ Insurance Company is an insurance company authorized to do and/or doing business in the Parish of East Baton Rouge, State of Louisiana and subject to the jurisdiction of this Honorable Court, which, on information and belief, at all times material to this action, provided policies of liability insurance to Chief Murphy J. Paul, Jr. and/or the BRPD and its employees, which policies provide coverage for the claims and damages asserted herein. XYZ Insurance Company, as the insurer for Chief Paul and/or the BRPD and its employees, is liable jointly, severally, and *in solido* with Chief Paul and the BRPD pursuant to Louisiana's Direct Action Statute, La. R.S. 22:1269.

## DAMAGES

232.    Plaintiff adopts, realleges, and incorporates by reference the preceding allegations of this Complaint as if copied herein *in extenso*.

233.    The conduct of the Defendants, as alleged hereinabove, was a direct, proximate, and producing cause of the damages resulting from the defendant officers' tortious conduct and violation of Deaughn's rights under the Louisiana and U.S. Constitutions, and of the following general and special damages:

      a.  survival damages resulting from all harm suffered by Deaughn prior to his death, including but not limited to:

          i.  conscious physical pain and suffering;

          ii.  physical impairment and disfigurement;

          iii.  mental anguish and anxiety;

          iv.  loss of liberty and life;

          v.  loss of earnings; and

          vi.  any medical costs;

      b.  wrongful death damages resulting from all past, present, and future harm suffered by Dyaughna Willis, including but not limited to:

          i.  mental anguish, anxiety, and grief;

          ii.  loss of financial support;

          iii.  loss of love, affection, services, and society; and

          iv.  loss of quality and enjoyment of life;

      c.  punitive damages;

      d.  any and all other damages both general and special, which will be more fully proven at trial; and

      e.  all other forms of relief provided by law or equity together with interest from the date of injury until paid, plus costs of these proceedings.

234.    Plaintiff is additionally entitled to attorneys' fees under 42 U.S.C. § 1988, prejudgment interest, and costs.

235.    Each of the defendant officers acted together in concert in engaging in the tortious conduct and civil rights violations alleged herein. By choosing not to intervene when given the opportunity, all defendant officers acquiesced to this conduct and are all liable pursuant to bystander liability under 42 U.S.C. § 1983. Therefore, all defendants are liable jointly, severally, and *in solido* as a result of their participation in the conduct giving rise to these allegations.

WHEREFORE, the Plaintiff also prays that this Complaint be deemed good and sufficient; that Defendants be served with a copy of same; that, after due proceedings, judgment be entered in favor of Plaintiff, Dyronnet Kador on behalf of her minor child Dyaughna Willis, and against Defendants, jointly, severally, and *in solido*, for all such damages as are reasonable under the premises set forth herein, together with legal interest thereon from the date of judicial demand until paid; for all costs of this proceeding, as well as penalties and attorneys' fees to the extent applicable; and for all other general and equitable relief to which Plaintiff may be entitled.

Respectfully submitted,

John S. Alford (No. 31594)
 of
THE ALFORD LAW FIRM
604 East Rutland Street
Covington, LA 70433
Telephone: (985) 888-0651
Fax: (985) 242-4249
John@AlfordFirm.com

- and -

*/s/ Brandon A. Naquin*
W. Raley Alford, III (No. 27354)
Brandon A. Naquin (No. 39998)
 of
STANLEY, REUTER, THORNTON, ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Fax: (504) 524-0069
wra@stanleyreuter.com
ban@stanleyreuter.com

*Counsel for Dyronnet Kador, on behalf of*
*her minor child Dyaughna Willis*